[No. D013099. Fourth Dist., Div. One. Jan. 21, 1992.]

KIMBERLY ANN WILKS et. al, Plaintiffs and Respondents, v. GEORGE HOM et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through IV.

**COUNSEL**

Chapin, Fleming & Winet, George E. Fleming, Virginia R. Gilson and Roger L. Popeney for Defendants and Appellants.

Casey, Gerry, Casey, Westbrook, Reed & Hughes and T. Michael Reed for Plaintiffs and Respondents.

## OPINION

**FROEHLICH, J.**—After a tragic explosion and fire in which one young girl was killed and another severely burned, a suit was brought alleging wrongful death and personal injury against the landlords of the residence where the explosion occurred. In this appeal we confirm that the mother of the injured child may receive damages for emotional distress occasioned by the negligently caused injuries to her daughter. We determine such damages are appropriate because the mother was contemporaneously aware that the explosion was causing the injuries although she did not actually see or hear her daughter being injured. We decide also that the trial court did not err in instructing the jury on negligence per se, in refusing to give a special instruction on landlord liability or in allowing graphic testimony of the children's injuries.[2]

### FACTUAL AND PROCEDURAL BACKGROUND

Kimberly Wilks (Wilks) and her three daughters lived in a residence they rented from George Hom, Tom Hom, Herbert Hom and Campo Lake Properties (appellants). On October 12, 1987, after the family had lived at the residence for about six months, Wilks's boyfriend, Arthur Ayres (Ayres) hooked up the house's existing propane system, which had not previously been in use, to a propane stove. Ayres then left the house to do an errand. At about that time Wilks and her three-year-old daughter, Janelle, were in the living room, where Wilks was using a vacuum cleaner. Wilks's other two daughters, nine-year-old Jessica and seven-year-old Virginia, were in their respective bedrooms. When Wilks finished vacuuming, she called to Virginia to pull the plug out of the socket in Virginia's room. As Virginia pulled the plug, there was an immediate explosion. Wilks and Janelle were blown out of the house. Wilks tried to return to the living room but was repelled by the heat. She went around the side of the house, broke down a door to Jessica's room and pulled Jessica out. She then went into Virginia's room and brought Virginia out of the house. Virginia died of her injuries several hours later. Jessica survived but was severely burned.

Wilks, as an individual and as guardian ad litem for Janelle and Jessica, and Steven Donnelly, Virginia's father, brought a cause of action against appellants for the wrongful death of Virginia and for damages for personal injuries to Janelle, Jessica and Wilks. A jury found that appellants Ayres and Wilks had been negligent, that Wilks's negligence was not a legal cause of damage to the plaintiffs, that Ayres's negligence was 15 percent responsible, and that appellants' negligence was 85 percent responsible. The judg-

---

[2]These issues are discussed in the unpublished portion of the opinion.

ment allocated to appellants 85 percent of the noneconomic damages and awarded damages to plaintiffs in the following amounts: Virginia's heirs, $307,964.80; Wilks, $876,755.93; Jessica, $1,778,608.40; and Janelle, $4,172.32.

Appellants contend the court erred in instructing the jury regarding recovery for emotional distress damages by a bystander, in instructing the jury on negligence per se and in erroneously refusing to give a special instruction regarding landlord liability.[3] Appellants also assert it was error for the court to allow graphic testimony about Virginia's and Jessica's injuries.

## DISCUSSION

### I. *The Trial Court Properly Instructed the Jury on Awarding Damages for Emotional Distress to a Bystander*

Appellants contend the trial court erred in instructing the jury on liability to a bystander who observes a negligently caused injury to a loved one.[4] The bystander theory of recovery for emotional distress caused by witnessing an injury was definitively established in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. In *Dillon*, a mother and her daughter sought damages for the emotional distress they experienced when watching a car hit and roll over another daughter/sister as she crossed the street. The Supreme Court determined that in deciding whether such damage could be deemed the proximate result of a defendant's negligence, courts should take into account such factors as:

"(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock

---

[3]Although appellants additionally contend in their opening brief that the trial court erred in modifying an instruction regarding a reduction in present value, they offer no argument concerning such matter. We thus shall consider the issue to be abandoned.

[4]The trial court instructed that the rules governing entitlement by a bystander to recovery of damages were as follows:

"Kimberly Wilks is entitled to recover damages for serious emotional distress caused by witnessing an event producing injury to her daughter, Jessica Faulkner, from a defendant whose negligence caused injury to Jessica Faulkner.

"In order to recover, plaintiff must establish (1) the defendant was negligent; (2) defendant's negligence was a legal cause of injury to Jessica Faulkner; (3) plaintiff was present at the scene of the accident at the time it occurred; (4) plaintiff was then aware that such accident caused the injury to Jessica Faulkner; and (5) as a result plaintiff suffered serious emotional distress.

" 'Serious emotional distress' is an emotional reaction beyond that which should be, which would be anticipated in a witness not related to the injured person, and which is not an abnormal response to the circumstances; it is found when a reasonable person would be unable to cope with the mental distress caused by the circumstances of the accident and injury to the near relative."

resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (68 Cal.2d at pp. 740-741.) The court predicted that more definitive boundaries of liability would be drawn in subsequent cases. (*Id.* at p. 741.)

Courts after *Dillon* did attempt further definition of the limits of liability. Evolution of the law under their several rulings, however, was neither uniform nor predictable. The Supreme Court in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814] observed that the trend of Court of Appeal decisions had resulted in relaxed guidelines and produced inconsistent rulings and critical comment. The factual setting of *Thing* was that of a mother whose emotional distress resulted from being informed her son had been struck by a car, then rushing to the scene and witnessing the damage minutes after the accident happened. The trial court had found this scenario inadequate to permit the mother's claim, ruling against her on summary judgment. The Court of Appeal disagreed, concluding the elements of negligent infliction of emotional distress were sufficiently established. ██ The Supreme Court reversed the appellate court ruling and then set out "to create a clear rule under which liability may be determined." (*Id.* at p. 664.) The court opined:

"In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited. (48 Cal.3d at p. 664.)

To illustrate how the *Dillon* guidelines had been relaxed, the *Thing* court reviewed prior cases, first pointing to *Krouse* v. *Graham* (1977) 19 Cal.3d 59 [137 Cal.Rptr. 863, 562 P.2d 1022]. There, the court had held that the plaintiff need not visually perceive the third party injury in order to satisfy the *Dillon* guideline, suggesting only that he must suffer shock from " ' "the sensory and contemporaneous observance of the accident, . . ." ' " (*Thing* v. *La Chusa, supra,* 48 Cal.3d at p. 656, quoting *Krouse* v. *Graham, supra,* 19 Cal.3d at p. 76.) In *Krouse,* the plaintiff sat in the driver's seat of his car and knew that his wife was at the curb closing the door to the back seat when a car negligently driven by the defendant approached the rear of the plaintiff's car, straddled the curb and hit and killed the plaintiff's wife. The *Krouse* court ruled it was sufficient that the plaintiff knew his wife's position an instant before she was struck, saw the defendant's car coming toward her at

high speed, and knew it must have hit his wife. (*Krouse* v. *Graham, supra,* 19 Cal.3d at p. 76.)

The *Thing* court noted:

"We also find in *Krouse, supra,* 19 Cal.3d 59, the roots of the uncertainty reflected by the instant case over whether the plaintiff must perceive the injury causing incident at all or may recover for emotional distress suffered on viewing its 'immediate consequences' even though not present at the scene when it occurred." (*Thing* v. *La Chusa, supra,* 48 Cal.3d at p. 656.)

The court observed that the uncertainty it noted derived from the *Krouse* court's approval of *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723]. *Archibald* had extended the potential scope of the bystander claim for negligent infliction of emotional distress by permitting recovery by a mother who did not witness the accident but arrived on the scene very shortly thereafter to see her son's injuries. The court in *Thing* distinguished the facts of *Dillon* and presumably *Krouse* by noting:

"Thus, it appeared that this court agreed that persons who were not present at the accident scene could recover damages for the emotional distress they later suffered when told by others of the injury to their loved one or when they later came to the scene." (*Thing* v. *La Chusa, supra,* 48 Cal.3d at p. 656.)

The *Thing* court then went on to illustrate how the *Dillon* guidelines had been relaxed in other areas by discussing cases which followed *Krouse*. (48 Cal.3d at pp. 657-661.)[5] Then, reiterating the necessity of limiting liability (*id.* at p. 664), the court determined recovery must be limited "to plaintiffs who personally and contemporaneously perceive the injury-producing event and its traumatic consequences." (*Id.* at p. 666.)[6]

The court thus set forth the rule as follows:

[5]The court's analysis included consideration of *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122], which denied recovery for fathers who were told their children had been stillborn, but led later courts to infer the injury-producing event need not be a sudden occurrence or accident; *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518], which led to the assumption by courts that physical injury was not required for direct victims or bystanders in actions for negligent infliction of emotional distress; and *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1], which held the injury-producing event need not be sudden or accidental and the negligent cause need not be immediately apparent. (*Thing* v. *La Chusa, supra,* 48 Cal.3d at pp. 657-661.)

[6]The court specifically disapproved the holdings of *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253 and *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553 [145 Cal.Rptr. 657] that contemporaneous awareness of the accident as it occurred was not necessary to state a cause of action. (*Thing* v. *La Chusa, supra,* 48 Cal.3d at p. 668.)

"[A] plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (*Thing* v. *La Chusa, supra,* 48 Cal.3d at pp. 667-668.)

The court noted: "These factors were present in *Ochoa* and each of this court's prior decisions upholding recovery for NIED [negligent infliction of emotional distress]."[7] (*Thing* v. *La Chusa, supra,* 48 Cal.3d at p. 668.)

Thus, the *Thing* court affirmed that bystander damages may be recovered only by a plaintiff who is present at the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim. The court's analysis did not indicate disapproval, however, of the holding in *Krouse* that the plaintiff need not visually perceive the injury while it is being inflicted.

■ The instruction in this case closely tracked the teaching of *Thing* and was also tailored to the facts of the case. It required that the plaintiff be "present at the scene of the accident at the time it occurred" and be "aware that such accident caused the injury to Jessica." Notable is the omission of a requirement that the plaintiff actually "witness" the injury to Jessica as and when it occurred. We find this instruction to be entirely in accord with the *Dillon* principle as refined in *Thing.* Following *Krouse,* we conclude it is not necessary that a plaintiff bystander actually have witnessed the infliction of injury to her child, provided that the plaintiff was at the scene of the accident and was sensorially aware, in some important way, of the accident and the necessarily inflicted injury to her child. Here, although Wilks could not visually witness the infliction of injuries to Jessica, she was most evidently present at the scene of the accident, was personally impressed by the explosion at the same instant damage was done to her child, and instantly knew of the likely severe damage to the child.

■ Appellants argue Wilks's testimony demonstrates that at the time of the explosion she was not then aware that it was causing injury to Jessica. We disagree. Wilks responded to questioning by her attorney as follows:

Q: "Could you see [Virginia] or Jessica when the explosion occurred?"

---

[7]In *Ochoa,* a mother had witnessed her son's suffering, because defendants refused to treat his illness properly or allow her to take him from juvenile hall to the family doctor. (*Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159.)

A: "No."

Q: "Do you know where they were when the explosion occurred?"

A: "Yes, they were both in their own rooms."

". . . . . . . . . . . . . . . . . . . . . . . . . ."

Q: "Did you say anything to anybody before the explosion occurred?"

A: "Yes."

Q: "What was that?"

A: "I asked [Virginia] to unplug the vacuum cleaner cord."

". . . . . . . . . . . . . . . . . . . . . . . . . ."

Q: "Do you have any recollection—what happened once you told her to unplug the plug, what happened after that, did she say anything back to you?"

A: "On the way to go unplug the cord, she said, 'yes, Mom.' "

Q: "Okay, then what happened then?"

A: "The house immediately exploded."

Q: "Where was [Virginia] when the house exploded?"

A: "In her bedroom."

". . . . . . . . . . . . . . . . . . . . . . . . . ."

Q: "How do you know if she unplugged the cord, because at that point you couldn't see?"

A: "Because I remember Jessica screaming, 'plug the cord back in.' "

". . . . . . . . . . . . . . . . . . . . . . . . . ."

Q: "What did you see or hear or feel when the explosion occurred?"

A: "The walls moving, a bright flash coming out of [Virginia's] bedroom into where I was standing. It went back into the room. It slammed the doors

with it. I heard the windows blow out of the front of the house in the girls' room and the living room."

Q: "What happened to you?"

A: "I was blown out of the front door."

Q: "What did you do then?"

A: "I immediately stood up, put my glasses on. I went into the front door. I probably got halfway in. It was warm in there, very hot. And my hair caught back on fire again. I ran back out the front door, going down to Jessica's bedroom door. That door was locked. I had to kick in the door, go in and get my daughter out."

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

"Then you said you immediately ran back [into] the house. How far did you get? Relative—let's say there was the front door. Where were you running to as you started to go back into the house?"

A: "To go back to [Virginia's] door to open—"

Q: "Is that the door where you saw the explosion come out of?"

A: "Yes, it is."

Wilks's testimony establishes that she knew Virginia and Jessica were in their bedrooms at the time of the explosion. She heard Virginia's voice just before the explosion and Jessica's scream just afterward. The girls' bedrooms were immediately adjacent to each other, being connected only by a low opening in the wall between them. Wilks experienced the force of the explosion, strong enough to propel her and her youngest daughter Janelle out the front door, and she knew the flash emanated from Virginia's room. Wilks had to have known at the time of the explosion that both Jessica and Virginia were experiencing injury. Her testimony is sufficient to establish the requirement that she personally and contemporaneously perceived the injury-producing event and its traumatic consequences. In any event, the evidence is assuredly sufficient to warrant the giving of the questioned instruction and amply supports the jury's verdict based thereon.

II.-IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote 1, *ante*, page 1264.

## DISPOSITION

The judgment is affirmed.

Wiener, Acting P. J., and Benke, J., concurred.