[No. B073932. Second Dist., Div. Four. May 4, 1995.]

JOAN MEIGHAN, Plaintiff and Appellant, v.
SAMUEL SHORE et al., Defendants and Respondents.

COUNSEL

Howard A. Kapp for Plaintiff and Appellant.

Samuel Shore and James R. McGrath for Defendants and Respondents.

## OPINION

EPSTEIN, Acting P. J.—In this case we hold that when a husband and wife consult an attorney about a personal injury action against a third party on account of personal injury to one of them, and the other spouse has a potential claim for loss of consortium of which the attorney is or ought to be aware, the attorney has a duty to inform that spouse of the consortium cause of action.

In this case, appellant and her husband thought that he had been the victim of medical malpractice. She sought out an attorney, and found respondent. He was a specialist in that field, and appellant arranged an appointment for herself and her husband to consult with him. They met in respondent's law office, where the case was discussed. Respondent agreed to take the case. He told appellant that her husband, rather than she, was the client, and that only he was to sign the retainer agreement. Nothing was said during the interview about appellant's right to pursue an action in her own right for loss of consortium, and neither appellant nor her husband had any idea that there was such a tort.

Respondent filed a suit for medical malpractice against a physician and a hospital. Appellant's husband was the only named plaintiff. More than one

year later, and after they had substituted in new counsel, appellant and her husband learned of appellant's entitlement to pursue an action for loss of consortium. By that time, the right had become barred against the health care providers. The medical malpractice suit was eventually settled, and appellant brought this action for negligence against respondent attorney and his law firm (hereafter respondent).

Respondent moved for summary judgment. Given the proofs presented to the trial court, it must be assumed for purposes of the motion that appellant had a viable cause of action for loss of consortium, which was barred by the time she learned about it. The principal issue framed in respondent's motion and the opposition was whether respondent owed a duty to inform appellant of her right to pursue a cause of action, or to alert her to the need to consult another attorney about it.

Given the particular circumstances of this case, and assuming that appellant's evidence matches her proofs in opposition to the motion, we conclude that respondent had that duty. The trial court erred in ruling that he did not.

We emphasize the narrowness of our holding. It pertains to the peculiar tort of loss of consortium, where both spouses consult an attorney with respect to a personal injury suffered by one of them and the attorney knows or could readily ascertain that the other spouse has a potential claim for loss of consortium, and where that spouse is unaware of his or her rights.

### FACTUAL AND PROCEDURAL SUMMARY

The lawsuit was brought by Joan Meighan, wife of Dr. Clement Meighan, an anthropologist and member on the faculty of the University of California, Los Angeles. The respondent is Samuel Shore, an attorney. Since the case reaches us on summary judgment, we apply a strict construction of the evidence presented by respondent and a liberal reading of the proofs submitted by the appellant. (See *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

The information available to respondent indicated that Dr. Meighan had experienced chest pains on October 8, 1988, and was taken to a hospital. He was in the emergency room for about an hour, then transferred to the coronary care unit under "coronary precaution" orders. His initial cardiogram was abnormal, but did not definitively show that a heart attack was in progress or that heart damage had occurred. In fact, he was suffering a heart attack. The first abnormal heart enzyme study was taken the next morning, about 4 a.m. The first cardiogram to show heart damage was taken about 7

a.m. that morning. Mrs. Meighan was with her husband for two to three hours in the coronary care unit, on the evening of October 8. She left for home about 10 p.m. after being told by the attending physician that Dr. Meighan was not having a heart attack. Respondent concluded that Dr. Meighan had a viable medical malpractice claim against the hospital and the attending physician for failing to administer medication that might have limited the extent of damage from the heart attack he suffered during the 12-hour period, 7 p.m. October 8 to 7 a.m. October 9.

Had respondent inquired, he would have ascertained the following about Mrs. Meighan's knowledge and impressions. She "had been trained as a nurse." He also would have ascertained she knew that heart attacks are caused by blood clots, that medication is available to dissolve clots, and that it is only effective during the early hours of a heart attack. Dr. Meighan had had two previous bypass procedures, and appellant was concerned about his care. She was particularly concerned because, she understood, the on-call cardiologist did not appear and initiate therapy for three and one-half hours after being called. She was hysterical and afraid, and demanded that the nurses get a cardiologist to examine her husband.

Respondent did not ask appellant or her husband whether either of them had any medical training, and he assumed they had none. Appellant had not come in as a referred client, and based on "the evolution of the facts in the case, at the conclusion of the meeting" respondent "ruled out the possibility "that she might have a viable right to proceed against the defendant for loss of consortium and emotional distress. Whether or not respondent formed that opinion (as we shall discuss, the trial court rejected his disclaimer), he never discussed the subject with appellant or her husband. Appellant declared that before meeting her present counsel (who was substituted in February 1991), she "had no idea that I might have any claim at all. I have never heard of a spouse of a negligently-injured person having any possibility of suing in her own right. Mr. Shore never mentioned as [sic] such thing to me, or my husband, in my presence or to my knowledge. [¶] If I had known of any such spousal rights, I would have joined my husband in the medical malpractice lawsuit." Her husband's testimony is to the same effect.

According to appellant's declaration, after being released from the hospitalization and treatment that were the subject of the underlying lawsuit, Dr. Meighan suffered physically and she was required to take over many things that he used to do. He was unable to provide her with emotional and physical support that he previously had given. Their personal relationship was affected. Appellant declared that her husband, who had been very active despite two bypass operations, "has been unable to provide me with the same

emotional support that I received before; his disability completely changed our lives. He was compelled to leave a job that he had had and had always loved for many, many years as a full Professor at UCLA due to his disability and his pervasive fear of another massive, and potentially fatal, heart attack."

When Dr. Meighan experienced lack of energy and other complaints after being released from hospitalization, appellant made inquiries to find out what remedies there were, if any, for the two of them. An attorney in San Diego was recommended, but his office was too far away. The San Diego attorney recommended respondent "as a leading professional who was really very good at this type of thing." She called respondent and set up an appointment. (Respondent's version is different: he declared that it was Dr. Meighan's cardiologist who made the referral.)

Both appellant and Dr. Meighan spoke to respondent about the case at the initial interview. Respondent said he would accept the case, and handed over a retainer agreement. The agreement had a blank space in the body for the name of the client to be inserted; it was left blank. The sole "client" signature was that of Dr. Meighan.

Although respondent does not recall making the statement, appellant testified at deposition that he said, in effect, that he was representing her husband, and not her. She described the statement, or statements, in various ways at deposition. She said that respondent "said he was not representing me, only my husband, or words to that effect." He did not say why. She and her husband had been together on everything, so she assumed "we would be together on this, and he made it very clear we were not." Respondent said "that Clem was the one that was suing, not as a couple, or something like that." She realized "yes, it's probably, you know, since he's the one that was injured, I had nothing to do with it."

It is undisputed that appellant understood respondent was not representing her and she never thought that he was; she did not seek and he did not offer legal advice to her about a potential lawsuit on her behalf; she did not sign a retainer agreement by which respondent might be paid for such representation; and respondent did not act as her attorney. Nevertheless, respondent had several conversations with appellant in which they discussed legal matters, and in which he "repeatedly gave [her] legal advice"—presumably about the medical malpractice action on behalf of Dr. Meighan.

Appellant's suit against respondent is premised on his duty to inform her of her right to sue the health care providers for loss of consortium and for

negligent infliction of emotional distress. Respondent moved for summary judgment. His moving papers presented two bases for that relief. First, he argued that since appellant was not his client, he owed her no duty. Second, he asserted that his decision not to pursue an action on her behalf was based on a reasonable and good faith exercise of discretion, and hence was not actionable under *Kirsch* v. *Duryea* (1978) 21 Cal.3d.303 [146 Cal.Rptr. 218, 578 P.2d 935, 6 A.L.R.4th 334]. The trial court expressly rejected the latter ground, stating that it was "specifically discounting the defendant's self serving declarations which the court does not believe and which this court is entitled to disregard. CCP Sec. 437c, subd. (e)." But it accepted the argument about lack of duty and, on that basis, granted summary judgment. (Appellant also moved for summary judgment. Her motion was denied.)

DISCUSSION

I

A

This case is principally about duty. More precisely, it concerns the duty of an attorney to a person so closely related with the client as to be in legal privity with that person, yet not the client.  ■  "The determination of duty is primarily a question of law. [Citations.] It is the court's 'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' (Prosser, Law of Torts (4th ed. 1971) pp. 325-326.) Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. [Citation.] While the question whether one owes a duty to another must be decided on a case-by-case basis, every case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as the result of their conduct. [Citation.] However, foreseeability of the risk is a primary consideration in establishing the element of duty." (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36], fn. omitted; see also *Bily* v. *Arthur Young & Co.*(1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745].)

In this case, the foreseeability of harm to the plaintiff is so clear that it would be easy to pass over the issue of duty. Yet, to paraphrase Justice Kaus (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 22 [192 Cal.Rptr. 233, 664 P.2d 137]), we may not put the foreseeability cart before the duty horse. Foreseeability is an important element in the duty analysis, but it is not coterminous with the doctrine.

Plaintiff's lawsuit is for professional negligence, in the nature of attorney malpractice. ■ That aspect of negligence consists of the failure of an attorney to "use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685]; *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 180 [98 Cal.Rptr. 837, 491 P.2d 421].)

To understand the application of duty in the context of this case, we begin with a discussion of the principal tort at issue—loss of consortium.

## B

■ Loss of consortium has been described as "loss of conjugal fellowship and sexual relations." (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 385 [115 Cal.Rptr. 765, 525 P.2d 669].) In somewhat more general terms, it has been referred to as the loss of "the noneconomic aspects of the marriage relation, including conjugal society, comfort, affection, and companionship." (*Deshotel* v. *Atchison, T. & S. F. Ry. Co.* (1958) 50 Cal.2d 664, 665 [328 P.2d 449]; overruled in *Rodriguez, supra,* 12 Cal.3d at p. 408; *Rodriguez, supra,* 12 Cal.3d at p. 405.) The tort endured a period of difficulty before it achieved full recognition in this state (see 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1416, p. 886), but recognition finally came in *Rodriguez.* The tort is only actionable by a spouse whose spouse is injured. It does not lie on behalf of a child (*Suter* v. *Leonard* (1975) 45 Cal.App.3d 744 [120 Cal.Rptr. 110]) or a parent (*Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538 [119 Cal.Rptr. 639], disapproved on other grounds in *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 170 [216 Cal.Rptr. 661, 703 P.2d 1]; *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461, 466 [138 Cal.Rptr. 315, 563 P.2d 871]).

The statute of limitations for loss of consortium is one year from the date of the spouse's injury, and there is no tolling during the pendency of the spouse's personal injury action. (*Priola* v. *Paulino* (1977) 72 Cal.App.3d 380, 383 [140 Cal.Rptr. 186].) It is undisputed that in this case the statute ran during the period respondent was representing Dr. Meighan.

Damages for loss of consortium are regarded as community property, as are other damages for personal injury suffered by a spouse. (See Fam. Code, § 780, which carries forward the pre-Family Code law reflected in former Civ. Code, § 4800, subd. (b)(4); *In re Marriage of Devlin* (1982) 138 Cal.App.3d 804, 807 [189 Cal.Rptr. 1].)

It is significant that the relationship between the spouses is one of privity. Thus, an unsuccessful personal injury suit by the physically injured spouse

acts as an estoppel that bars the spouse who would claim damages for loss of consortium. The reason is that, "[u]nder California law, spouses are in privity with each other where the cause of action in the prior litigation was 'community in nature' and the 'proceeds of any judgment that might have been recovered . . . would have belonged to both husband and wife, as community property,'" as they do for loss of consortium. (*Mueller* v. *J. C. Penney Co.* (1985) 173 Cal.App.3d 713, 723 [219 Cal.Rptr. 272], quoting *Zaragosa* v. *Craven* (1949) 33 Cal.2d 315, 321 [202 P.2d 73, 6 A.L.R.2d 461].)

The circumstance of privity bears on the duty of an attorney to the spouse of a physically injured client. But it does not make the spouse privy to the attorney-client contract. Nor is it determinative by itself of the issue of duty. We turn next to a fuller examination of duty in the context of the consortium tort.

## C

At common law, the starting point is privity: an attorney was not liable for professional negligence to anyone other than the client whose cause he or she engaged to undertake. (See *Winterbottom* v. *Wright* (1842) 152 Eng.Rep. 402, 405; *Heyer* v. *Flaig* (1969) 70 Cal.2d 223, 228 [74 Cal.Rptr. 225, 449 P.2d 161], disapproved on other grounds in *Laird* v. *Blacker* (1992) 2 Cal.4th 606, 617 [7 Cal.Rptr.2d 550, 828 P.2d 691]; 1 Mallen & Smith, Legal Malpractice (3d ed. 1989) § 7.4, p. 364 [hereafter, Mallen and Smith].) California's journey away from this doctrine began nearly 40 years ago with the first of a pair of decisions by Chief Justice Gibson. These decisions have guided the development of California law, and of many other jurisdictions, ever since.

The first is *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]. The court dealt with a nonattorney notary who had drawn a will for a testator who wished to devise all of his property to the plaintiff. Because of the notary's negligence, the putative will was ineffective, and the plaintiff received only one-eighth of the estate through the law of intestate succession. She sued the notary for the difference. His defense was classic: he was not liable in negligence to anyone not in privity to his contract with the testator. Since that excluded the plaintiff, he argued, he was not liable to her for his error. (49 Cal.2d at p. 648.)

The argument was rejected. The court could have rejected it on a third party contract beneficiary theory, reasoning that plaintiff was the intended beneficiary of the contract between the notary and the testator. But it did not. Instead, the court formulated the five-point test by which the case is known:

"The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (49 Cal.2d at p. 650.)

Measured by these standards, the court had no difficulty in finding a duty by the notary. (49 Cal.2d at p. 651.)

The second case, *Lucas* v. *Hamm*, *supra*, 56 Cal.2d 583, is similar to *Biakanja*, except that the person engaged to draw the will was an attorney, and therefore did not commit a crime by unauthorized practice of law. The court reiterated its earlier reasoning (56 Cal.2d at p. 588) and added a further consideration, since the defendant was an attorney: whether recognition of liability would impose an undue burden on the profession. The court concluded that it would not, "particularly when we take into consideration that a contrary conclusion would cause the innocent beneficiary to bear the loss." (56 Cal.2d at p. 589.) Thus, the lack of contract privity between the beneficiaries and the attorney engaged by the testator did not preclude the plaintiffs from maintaining an action in tort against the attorney. (*Ibid.*) The court went on to conclude that the beneficiaries also were entitled to recover on a third party beneficiary theory. (*Id.* at p. 591.) Reaching the merits of liability, the court found that the attorney was not culpable for running afoul of the hypertechnical rules against perpetuities and restraints on alienation. (*Id.* at p. 592.)

The subject was revisited in *Heyer* v. *Flaig*, *supra*, 70 Cal.2d 223. The issue in that case was when the statute of limitations began to run in a *Lucas* v. *Hamm* situation. The court held that it ran from the time the testator died without correcting the negligently drawn will, because it was at that point that the injury became fixed and irremediable. (*Id.* at p. 225.) The court discussed its rulings in *Biakanja* and *Lucas*, including the discussion of third party beneficiary in the latter. That theory, the court said, was "conceptually superfluous since the crux of the action must lie in tort in any case; there can be no recovery without negligence." (*Id.* at p. 227.) "The *Biakanja* line of cases does no more than apply to the issues there involved [the] concepts of duties and rights based upon the relationship between the tortfeasor and the injured parties." (*Id.* at p. 228.) Duty was imposed "because of the relationship between the attorney and the intended beneficiary; public policy requires that the attorney exercise his position of trust and superior knowledge

responsibly so as not to affect adversely persons whose rights and interests are certain and foreseeable." (*Id.* at p. 229.) While the duty accrued directly in favor of the intended testamentary beneficiary, its scope was determined by reference to the attorney-client context. The attorney had a duty to exercise due care as to the interests of the intended beneficiary. That is not to say the attorney-client contract is the "fundamental touchstone" to fix the attorney's duty to a third party, but the actual circumstances under which the legal services are undertaken will bear on a judicial assessment of the care with which they are performed. (*Ibid.*)

Later cases have refined the doctrine, explaining and applying it, and keeping it true to its original analysis.

In *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104 [128 Cal.Rptr. 901], the court dealt with a pleading that alleged attorney negligence in the preparation of an opinion to be shown to and relied upon by a third party prospective creditor. Its alleged objective was to induce the third party to loan money to a partnership, and it succeeded in that purpose. When the legal relationship of the persons involved in the partnership receiving the loan turned out to be other than what the opinion said it was, the creditor sued the law firm that prepared the opinion. The trial court sustained a demurrer to the complaint. The resulting order of dismissal was reversed. The court explained that the defendant attorneys undertook on behalf of clients to assist in securing loans from various persons, including the plaintiff, for the benefit of a partnership. The opinion letter they prepared was drawn for the purpose of influencing the conduct of persons in the position of the plaintiff, and that conduct—making the loan—was entirely foreseeable. "We have no difficulty, therefore, in determining that the issuance of a legal opinion intended to secure benefit for the client, either monetary or otherwise, must be issued with due care, or the attorneys who do not act carefully will have breached a duty owed to those they attempted or expected to influence on behalf of their clients." (57 Cal.App.3d at p. 111.)

*Roberts* was part of the backdrop for the next Supreme Court decision in the area, *Goodman v. Kennedy* (1976) 18 Cal.3d 335 [134 Cal.Rptr. 375, 556 P.2d 737]. The claim in that case was that an attorney had negligently advised shareholders of a closely held corporation that shares of stock could be issued to them and sold by them to third parties without jeopardizing the corporation's exemption from registration under the Securities Act of 1933. (15 U.S.C. § 77c(b).) The clients acted on that advice, which proved wrong. A third party who purchased the stock sued the attorney. The Supreme Court agreed with the trial court decision that the attorney owed no duty to the

ultimate purchaser of the stock. The reason was that counsel had no relationship that would give rise to a duty to a third party. There was no allegation that the advice to the client was communicated to the stock purchaser, or acted upon by that person, or that the attorney knew or should have known that it would be. The court distinguished *Roberts*: "In that situation [i.e., the facts in the *Roberts* case] the attorney owes the plaintiff a duty of care in providing the advice because the plaintiff's anticipated reliance upon it is 'the end and the aim of the transaction.' [Citation.]" (18 Cal.3d at. p. 343, fn. 4.) And unlike the will beneficiary cases, the plaintiffs in this case were not persons upon whom the clients intended to confer a benefit. "To make an attorney liable for negligent confidential advice not only to the client who enters into a transaction in reliance upon the advice but also to the other parties to the transaction with whom the client deals at arm's length would inject undesirable self-protective reservations into the attorney's counseling role. The attorney's preoccupation or concern with the possibility of claims based on mere negligence (as distinct from fraud or malice) by any with whom his client might deal 'would prevent him from devoting his entire energies to his client's interests' [citation]. The result would be both 'an undue burden on the profession' [citation] and a diminution in the quality of the legal services received by the client." (*Id.* at p. 344.)

Justice Mosk filed a dissenting opinion in *Goodman* v. *Kennedy, supra,* 18 Cal.3d at page 350. In it he pointed out that until recently, absence of privity of contract had precluded anyone but a client from recovering for professional negligence by an attorney or an accountant. The classic statement of that rule was traced to the opinion of then Chief Judge Cardozo in *Ultramares Corporation* v. *Touche* (1931) 255 N.Y. 170 [174 N.E. 441, 74 A.L.R. 1139], a case concerning accountants' liability. Since then, he pointed out, there has been a steady erosion of the privity requirement in malpractice actions, "and California has been in the forefront of jurisdictions extending the scope of professional liability to third persons." (18 Cal.3d at p. 351.) In *Heyer*, "the concept of privity as a bar to the maintenance of an action in these circumstances was abandoned altogether, and it was held that the defendant was liable not because he had breached a contract with the testator but because he breached a duty owed directly to the injured party, i.e., that liability was based on tort rather than on a contractual theory." (*Ibid.*)

The doctrine of privity in the related area of accountant malpractice was reviewed in *International Mortgage Co.* v. *John P. Butler Accountancy Corp.* (1986) 177 Cal.App.3d 806, 811, 820 [223 Cal.Rptr. 218]. The court concluded that *Ultramares* should be rejected, and that, at least in the context of accountancy, tort liability should be limited only by the concept of foreseeability. This pure foreseeability approach was itself rejected by our Supreme

Court in *Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th 370, 389. In reaching that result, the court reviewed its decisions on attorney liability to third parties. The *Biakanja* factors were reiterated (*Id.* at p. 397.) The court applied the "intent to benefit" approach of the Restatement Second of Torts, section 522, in limiting liability for negligent misrepresentations in an audit: the auditor's duty does not run to anyone who might see and rely upon its opinion, but only to those to whom or for whom the misrepresentations were made. (3 Cal.4th at p. 408.) The *Roberts* and *Goodman* cases were cited as consistent with a limited approach to liability. (*Id.* at pp. 410, 411.)

These cases, and others, concern liability for erroneous advice, relied upon by third parties, or negligent drafting that thwarts a client's expressed wishes. The duty to warn a client or prospective client of the need to file an action before the running of the statute of limitations—an issue very close to the problem in this case—was discussed in *Flatt* v. *Superior Court* (1994) 9 Cal.4th 275 [36 Cal.Rptr.2d 537, 885 P.2d 950]. The issue in the case was the scope of an attorney's duty to advise a new or prospective client about the need to file a lawsuit, when the attorney learns that the suit would irreconcilably conflict with his or her duty to an existing client. The court concluded that the requirement of undivided loyalty to the first client negates any duty to inform the second client of the statute of limitations applicable to the proposed suit. It extends even to negate a duty to inform the second client of the advisability of seeking alternative counsel. (*Id.* at pp. 278-279.) The court emphasized the narrowness of its holding: it applies only where there is a mandatory and unwaivable duty not to represent the second client. The court cautioned that "in the absence of such an irreducible conflict and mandatory duty to withdraw, an attorney's duty to advise a new or even a 'prospective' client, once the nonengagement decision has been taken, may well be more extensive. . . ." (*Id.* at p. 279.)

There was a triable issue of material fact in *Flatt* whether an attorney-client relationship had been established between the plaintiff and the attorney. The court noted the decision in *Miller* v. *Metzinger* (1979) 91 Cal.App.3d 31 [154 Cal.Rptr. 22], in which summary judgment for an attorney was reversed in a negligence action based upon the attorney's failure to warn the client about the approaching statutory bar. In that case, while no fee had been paid nor retainer agreement executed, the attorney had agreed to evaluate the claim of the prospective client and advise her as to appropriate action, and there was evidence that he had given "a little bit of an opinion" about the validity of the client's claim. (*Flatt* v. *Superior Court*, *supra*, 9 Cal.4th. at p. 282, fn. 1.)

One other observation in *Flatt* is pertinent to our case. The client in that case knew he had a claim and that he had to find a new attorney in order to

pursue it. (9 Cal.4th. at p. 291.) The same would be true of anyone seeking representation for a personal injury to himself or herself, or to seek redress for some other known right. It is not true in this case where, according to appellant's proofs, both she and her husband were completely unaware of a consortium cause of action. The quasi-derivative nature of the tort is such that unawareness by a layperson is hardly surprising. Not knowing that she had a cause of action to pursue, appellant did not pursue it during the entire period that respondent was representing her husband. As we have seen, by the time she learned of its existence, it was barred.

Other California cases express no quarrel with California's abandonment of privity as a requisite, but refuse to find duty in fact settings clearly outside the *Biakanja* criteria. (See *Mason* v. *Levy & Van Bourg* (1978) 77 Cal.App.3d 60, 66 [143 Cal.Rptr. 389] [no duty by attorney, to whom contingent fee case was referred, to referring attorney to handle the case in such manner as to produce fees]; *De Luca* v. *Whatley* (1974) 42 Cal.App.3d 574 [117 Cal.Rptr. 63] [no duty by attorney for defendant not to call witness in defense, even though doing so may jeopardize interests of the witness]; *Home Budget Loans, Inc.* v. *Jacoby & Meyers Law Offices* (1989) 207 Cal.App.3d 1277, 1284 [255 Cal.Rptr. 483] [attorney duty found since facts brought case within *Roberts* v. *Ball, Hunt, Hart, Brown & Baerwitz,* rather than *Goodman* v. *Kennedy*]; *Omega Video, Inc.* v. *Superior Court* (1983) 146 Cal.App.3d 470, 480 [194 Cal.Rptr. 574] [no duty to protect interest of adverse party]; *Fox* v. *Pollack* (1986) 181 Cal.App.3d 954 [226 Cal.Rptr. 532] [buyers went to office of defendant, seller's attorney, who read sale papers to them and asked if they understood them; fact buyers "thought" defendant was their attorney insufficient to impose liability]; *Burger* v. *Pond* (1990) 224 Cal.App.3d 597, 606 [273 Cal.Rptr. 709] [no duty by husband's attorney, representing him in dissolution proceeding, to prospective second wife, even though attorney knew of their marriage plans; foreseeability alone is insufficient for legal duty].)

Mallen and Smith have undertaken a national survey of the cases. They acknowledge an abundance of authority for the privity rule, most notably in New York, but point out that the vast majority of the cases that adhere to it arise in factual situations where no jurisdiction would allow a plaintiff to recover. (1 Mallen & Smith, *supra,* § 7.10, pp. 376-379.) The modern trend, they conclude, "is to recognize the existence of a duty beyond the confines of those privy to the attorney-client contract." (*Op. cit. supra,* § 7.11, p. 381.) The trend manifests itself through two theories: the traditional third party beneficiary approach, and the California multicriteria test. The California approach, they find, "has been cited with approval and accepted with near unanimity by those jurisdictions which have examined the issue." (*Op. cit.*

*supra*, at p. 383, and fn. 5; the authors cite decisions from 20 American jurisdictions, and 1 English precedent.)

Appellant has cited only one case factually close to our own. That decision, *Jordan* v. *Lipsig, Sullivan, Mollen & Liapakis, P.C.* (S.D.N.Y. 1988) 689 F.Supp. 192, involved the rights of a husband whose wife allegedly was represented by the defendant law firm. There was a dispute whether the plaintiff's wife actually had engaged the firm to bring a personal injury lawsuit on her behalf. It failed to do so, and her claim was barred. The wife sued for malpractice and her husband sued for loss of derivative consortium rights. Applying New York law, the court found the husband's rights were restricted by the New York privity rule. (*Id.* at p. 196.) While the husband was not a client of the law firm, and the wife's claim was barred, his claim was intricately interwoven with hers, and it is unreasonable to expect that he would have sued independently. "A spouse should reasonably be able to rely on the representation afforded to the injured spouse to inform him or her of his or her potential derivative claims for loss of consortium. Therefore, this Court finds that to the extent that defendants were negligent in not timely filing suit on behalf of [the wife], [the husband] may seek to recover against defendants for his potential claim of loss of consortium." (*Id.* at p. 197, fn. omitted; see also *Waggoner* v. *Snow, Becker, Kroll, Klaris & Krauss* (9th Cir. 1993) 991 F.2d 1501, 1506 [California allows third party recovery absent privity, while New York generally precludes it].)

■ We are satisfied that, in California, professional liability is not dependent upon privity of contract, but the presence or absence of a client's intent that the plaintiff benefit from or rely upon the attorney's services is particularly significant in the determination of duty. Intended reliance may be express or implicit, obvious or subtle. In the final analysis, application of duty depends on the particular factual setting of the case. We now turn to a consideration of duty in the circumstances of this case.

## D

The motion for summary judgment granted by the trial court was filed in 1993, and hence was subject to the 1992 amendments to Code of Civil Procedure section 437c, the summary judgment law. (See generally, *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 581 [37 Cal.Rptr.2d 653].) Nevertheless, since appellant accepted her burden of presenting evidence to demonstrate triable issues of material fact, we have reviewed the evidence of the parties under the traditional test, which resolves doubts in favor of the responding party. (See *Molko* v. *Holy Spirit Assn.*, *supra*, 46 Cal.3d at p. 1107.)

██ We briefly reprise the essential facts. Appellant sought out and arranged an appointment with respondent in connection with her husband's possible action for medical malpractice. Neither she nor her husband had ever heard of the tort of consortium, and had no idea it existed. Respondent was aware of it and its application, but said nothing about it to appellant or her husband during the joint interview in which he agreed to take the case, or thereafter. Respondent told appellant that her husband was the plaintiff and his client, not her, and she never thought he was acting as her lawyer. Appellant had a viable, assertable consortium cause of action, but did not assert it because she knew nothing about it during the period of respondent's representation. The action was barred by the time she knew better.

It is significant that respondent's undoubted client, Dr. Meighan, had a community property interest in appellant's recovery for loss of consortium, just as appellant had an interest in his recovery of damages for medical malpractice. The consortium tort is so closely interwoven with the personal injury action that plaintiff and her husband were in privity with respect to it; a loss of the husband's lawsuit would have collaterally estopped his wife from prosecuting her action for loss of consortium. Respondent had an obligation to advise Dr. Meighan of these rights.

Unlike other cases in which it is obvious to the potential client that he or she must obtain other representation in order to pursue a claim in the event the consulted attorney should refuse to undertake the cause, in this case it cannot be assumed that appellant or her husband was aware of his or her rights under the tort, and in fact the evidence shows that they were not. More significantly, respondent did not refuse to undertake the representation; he accepted the case presented to him, but neglected or chose not to say anything about the consortium cause of action even though his declaration reveals he considered it and decided it was not worth pursuing.

While the Meighans were unaware of the full extent of their rights, it may be inferred they expected that, if respondent agreed to take the case, he would at least inform them of what they were. That surely was the expectation of Dr. Meighan, the acknowledged client. It also was the reasonable expectation of appellant.

There is one further circumstance: respondent's statement to appellant that he was representing Dr. Meighan, not her. Respondent argues that an attorney may refuse to represent a client and that malpractice liability cannot be affixed on the attorney who does so, even though, as a result, the potential client's rights are not prosecuted and thereby lost. We agree with that contention as a general proposition: a simple refusal to undertake representation, without any other facts (e.g., an undertaking to investigate the case, to

advise about it, to make a referral, or delay during a critical period) cannot fix malpractice liability on the attorney.

Here, however, respondent has not established the clear picture he postulates. His statement to Mrs. Meighan was not made in the context of a *refusal* to represent her. There was, in fact, no discussion of her rights at all. For all that the record shows, it was simply an explanation to Mrs. Meighan of the reason she was not to sign the retainer agreement. Given the context of the consultation and the nature of the tort at issue, respondent's statement cannot foreclose her rights as a matter of law.

All of this points to a finding of a duty by respondent. The same conclusion is reached when the facts are analyzed under the *Biakanja* factors.

(1) *The extent to which the transaction was intended to affect Mrs. Meighan.* Mr. and Mrs. Meighan sought out respondent to take their "case," which they perceived as a lawsuit against certain of Dr. Meighan's health care providers. The normal expectation of persons in their position is that the attorney will advise them of their rights with respect to the injuries suffered. We infer they held that expectation. The marital community would benefit by any recovery of damages by either spouse; each had a community property interest in such recovery. Thus, while the retainer agreement did not expressly name appellant as a party to be benefited by respondent's services, the transaction necessarily affected her interests.

(2) *Foreseeability of harm to Mrs. Meighan.* It was entirely foreseeable that appellant would lose her rights to pursue an action for loss of consortium unless respondent at least alerted her to its existence before it became barred by the statute of limitations.

(3) *Certainty that Mrs. Meighan suffered injury.* It was inevitable that the cause of action would become barred upon the running of the statute of limitations without a suit commenced on behalf of appellant. That is what happened.

(4) *Closeness of connection between respondent's conduct and injury.* The effect was direct; no attenuation analysis is required.

(5) *Policy of preventing future harm.* The duty at issue was to inform Mrs. Meighan of the existence of her cause of action for loss of consortium. Respondent was not required to represent her in a lawsuit to recover for that tort. Had he given the warning, it would have been up to the Meighans to

decide whether to pursue the claim; and if so, with what attorney. The harm is the loss of rights by reason of a failure to advise under circumstances where advice is reasonably expected. Requiring that it be given in these limited circumstances will discourage its loss by an uninformed failure to act. It also will reduce the prospect of secondary litigation, as in this case, over that failure.

(6)   Finally, we consider the criterion added by *Lucas: whether recognition of liability under the circumstances would impose an undue burden on the profession.* We have emphasized the unusual setting of this case. That setting informs the narrowness of the duty: where husband and wife consult an attorney about a lawsuit over personal injury to one spouse and the other has a potential claim for loss of consortium, of which he or she is unaware, and the attorney agrees to represent the injured spouse, counsel has a duty to inform the other spouse of the potential consortium claim. Imposition of a duty in this limited situation will not impose an undue burden on the profession. To the contrary, it will vindicate the reasonable expectation of persons who seek legal advice about their rights, the providing of which is the unique office of an attorney.

We conclude that, in these circumstances, respondent had a duty to inform the Meighans of the existence of their rights under the consortium tort. If he thought it was without merit, or that pressing it would weaken Dr. Meighan's case, or if he simply did not want to handle it, he was perfectly free to act on those conclusions. What he was not free to do was to keep his evaluation entirely to himself, without warning the Meighans that the right existed and would be lost unless pursued. Had he done that, the Meighans could have made their own decision about whether they wished to pursue the action, and, if they did, whether they wanted to find other counsel who would represent both the malpractice and consortium causes of action.

E

Appellant's theory against respondent is that his failure to inform her of her rights caused her to lose not only a cause of action for loss of consortium, but also an action against the health care providers for negligent infliction of emotional distress. We need not decide whether respondent had a duty to inform appellant about her right to sue for the negligent infliction tort since, on the record before us, it is plain that she had no viable cause of action on that theory.

In *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], the Supreme Court recognized the right of a person, who is

not physically injured by the impact of an accident, to recover damages for the shock of witnessing a serious injury. But the court established restrictive guidelines for the tort. The plaintiff had to be located near the scene of the accident, rather than a distance away from it; the shock had to result from direct emotional impact on the plaintiff's sensory and contemporaneous observance of the accident, rather than from learning about it from others; and the plaintiff had to be closely related to the accident victim, rather than unconnected or only distantly related. (*Id.* at p. 741.)

There was some drift from the *Dillon* factors as originally stated. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 842 et seq., p. 198.) But they were restated as requirements in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814]. In order to recover for witnessing an injury negligently inflicted on a third person, the plaintiff must prove that he or she "(1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (*Id.* at pp. 668-699, fns. omitted.)

Mrs. Meighan obviously satisfies the close relationship criterion, and we shall assume she has presented a triable issue of material fact about the extent of her emotional distress. Appellant's problem is with the second criterion: presence at the scene of the injury and awareness that it is causing injury to the victim. She was at the hospital for the first few hours Dr. Meighan was there, and was distressed over the hospital's delay in getting the on-call cardiologist to come in. Her information about the importance of early treatment added to, or was the basis of, her distress. The cardiologist did arrive, informed appellant that her husband was not experiencing a heart attack, and she went home. She returned the next morning to find that he had suffered a heart attack.

These facts do not satisfy the witness and awareness requirement of *Thing*. They are in sharp contrast with *Wilks* v. *Hom* (1992) 2 Cal.App.4th 1264 [3 Cal.Rptr.2d 803], for example, in which a mother was in the living room of her house when propane gas exploded, forcing her out the door, and during which she saw a flash emanate from the bedroom where she had left her daughter, and from which she heard her daughter scream. They are also distinguished from *Ortiz* v. *HPM Corp.* (1991) 234 Cal.App.3d 178 [285 Cal.Rptr. 728], in which we held the criterion was satisfied where a wife saw her husband trapped in a running plastic injection molding machine, his body limp and dripping blood.

The case is closest to *Goldstein v. Superior Court* (1990) 223 Cal.App.3d 1415 [273 Cal.Rptr. 270], in which negligent infliction recovery was denied to parents whose son had received an overdose of radiation, causing a grotesque alteration in his appearance and his eventual death. While the parents did not see the radiation being administered, they did witness its results, and they argued this should be sufficient. But understanding perception of the injury-causing event is essential, and if it cannot be perceived, recovery cannot be allowed. *Thing's* policy statement requires that plaintiffs "experience a contemporaneous sensory awareness of the causal connection between the negligent conduct and the resulting injury." (*Id.* at p. 1427.)

## II

█ Finally, we consider respondent's argument that liability cannot be imposed because his decision not to raise the loss of consortium issue (or the possibility of a negligent infliction claim) was based on his professional and reasonable judgment that the claim lacked merit. (*Kirsch v. Duryea, supra,* 21 Cal.3d 303.) The reasonableness of that claim was controverted by the declaration from appellant's counsel, which was sufficient to raise a triable issue on the point. More fundamentally, the claim rested on respondent's declaration describing his mental process in reaching his conclusion. The trial court disbelieved his statement, exercising its authority under Code of Civil Procedure section 437c, subdivision (e). That provision allows a trial court to deny a motion for summary judgment which otherwise would be granted where a material fact is a person's state of mind or lack thereof, "and that fact is sought to be established solely by the individual's affirmation thereof." That is our case, and there was no abuse of discretion.

### DISPOSITION

The judgment is reversed. Appellant is to have her costs on appeal.

Vogel (C. S.), J., and Hastings, J., concurred.

A petition for a rehearing was denied June 5, 1995, and respondents' petition for review by the Supreme Court was denied August 24, 1995.