[Civ. No. 22619. Second Dist., Div. Two. Apr. 8, 1958.]

HALL HUGHEY et al., Respondents, v. CONTE CANDOLI, Appellant.

(Two Cases.)

Crider, Tilson & Ruppé for Appellant.

Mabel Walker Willebrandt and W. Alan Thody for Respondents.

ASHBURN, Acting P. J.—Defendant appeals from an order granting a new trial upon the ground of insufficiency of the evidence. The order applies to two actions growing out of an automobile collision.

Plaintiff Yvonne Hughey was eight months pregnant at the time of the accident. She and her husband brought one action to recover for personal injuries to her, the husband's loss of her services and damage to the automobile which she was driving at the time of the accident. Another action brought by both sought damages for wrongful death of the child, which lived only one day after its delivery through Caesarean section. The two cases were tried together and it was stipulated that a single verdict should be rendered for or against the plaintiffs. Verdict having gone for defendant, the court granted a new trial in due course. Counsel for both sides devote their arguments wholly to the question of the sufficiency of the evidence.

Appellant argues two points, (1) that plaintiff Yvonne Hughey was contributorily negligent as matter of law, and (2) that the death of the child was not proximately caused by negligence of the defendant.

█ The applicable rule of review is stated in *Brown* v. *Guy*, 144 Cal.App.2d 659, 661 [301 P.2d 413]: ''Upon the consideration of a motion for a new trial the court must make an independent appraisal of the evidence, including all presumptions and reasonable inferences, and must judicially determine whether the judgment effects a miscarriage of justice. █ In considering such motion the trial court is not bound by a conflict in the evidence but may be governed by any substantial proof that would reasonably warrant a judgment for the moving party even though such evidence consists of nothing more than inferences from established facts. █ On appeal from the order it will not be reversed unless the reviewing court concludes that as a matter of law there is no substantial evidence to support a contrary judgment.'' Quoting from a Supreme Court case *Thomas* v. *Moore*, 146 Cal.App.2d 59, 61 [303 P.2d 624], says: '' 'The trial court in considering a motion for new trial is not bound by a conflict in the evidence, and has not abused its discretion when there is any evidence which would support a judgment in favor of the moving party. [Citations.] The only conflict may be the opposing inferences deducible from uncontradicted probative facts. In such case the trial court may draw inferences opposed to those accepted by the jury, and may thus resolve the conflicting inferences in favor of the moving party, for ''It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment

that an appellate court will reverse the order of the trial court.'' [Citations.]' ''

The question of contributory negligence goes to liability in each case and will be first considered. The accident occurred on November 29, 1954, about 7 p.m., at the well-lighted intersection of Sunset Boulevard and Wilcox Avenue in Los Angeles. Sunset runs east and west and Wilcox north and south. On the northeast corner is the showroom of Mercedes-Benz automobile agency. Two impartial witnesses saw the accident from that vantage point. We accept for purposes of the following statement testimony and inferences favorable to plaintiffs, as we must do.

Mrs. Hughey was driving a white Jaguar convertible automobile in an easterly direction, and the top was down. As she came to Wilcox she stopped with the traffic, then moved into the intersection with the green light of the traffic signal in her favor. She gave a signal for a left turn, intending to go to her home which was to the north, but she had to stop again to let westbound cars pass in front of her. As she indicated this intention a westbound vehicle gave a left turn signal and started turning to the south. The driver of that car waved with his hand, indicating that she should go ahead with her turn. Each car was in a lane next to the double line, designated in the evidence as lane 1. Having looked to the east for westbound traffic, plaintiff saw that all was clear and gradually started her turn, proceeding very slowly, ''literally crawling'' as defendant expressed it, and continuing to make her left turn signal. When entering westbound lane 1 she looked again and all was clear. As she crossed lane 2 (the center one of the three westbound lanes) defendant's Cadillac appeared out of the nowhere and struck her Jaguar in the right side. According to Mr. Bruno Hahn, who was watching the Jaguar from the Mercedes-Benz showroom, that car ''seemed to bounce, say, a matter of, oh, six inches or a foot and a half, somewhere within that distance. It gave a sort of a shudder. . . . it was pushed, as I said, somewhere between six inches to a foot or foot and a half.'' Mrs. Hughey was thrown against the side of her car, to the left and back. She was helped into the Mercedes-Benz agency, being then greatly shaken, sore and nervous. While there for an hour or less she was faint and dizzy and had some pain in her left side, in the lower left quadrant of the abdomen. The sequelae will be reviewed in the discussion of responsibility for the baby's death.

Defendant Candoli did not see the Jaguar until he was almost upon it. The attention of Mr. Hahn and his wife was drawn to the Cadillac by the screech of its brakes. That car left 43 feet of straight skid mark which began, as computation and defendant's own testimony show, at the easterly line of the crosswalk on the east side of Wilcox; the accident occurred 26 feet west of the crosswalk, which was 17 feet wide. Defendant testified that he put on his brake as soon as he saw plaintiff. Obviously he was going too fast. He further said that he had been following for two blocks or more the car that made the left turn to the south when arriving at Wilcox, but insisted that he was in lane 2 all that time and the other car in lane 1. If he had been in lane 2, Mrs. Hughey would have seen him when she looked to the east on Sunset.

The trial judge, when disposing of the motion for new trial, said in part: "I would say that a moving picture of what took place out there that evening would disclose him coming from behind that automobile that was parked there making a left turn and coming fast, and not too close behind that vehicle, because he had to get out there in that lane where those skid marks were long enough to have delineated a course of direction. I didn't think his testimony was persuasive. I felt that it was nonconvincing and shaky. The lady told a very forthright story. She was consummately careful." Also, "As I took notes and harkened to the testimony of the various witnesses on the question of liability, I gained the impression that Candoli was rattled, not only at the time of the accident, but he was confused, and confessed that he was in a state of confusion as he testified in the courtroom. . . . I was completely convinced when I heard this evidence that the plaintiff had made a case of liability against this defendant, and when that jury came in with a verdict unanimous for the defendant, I was almost shocked to the point where I could not speak. . . . Then, when I analyze that evidence in the light of the testimony and the clear picture that the Hahns gave, I thought it added up to an overwhelming case of liability."

Appellant's counsel argue that the Jaguar top was down, the body very low, some three feet from the ground to the top of the door, that the south turning car obscured plaintiff's vision of the westbound Cadillac, and vice versa; that she went into lane 2 without looking after she got into position to do so, and therefore was negligent as a matter of law. These were doubtless permissible factual inferences but they

are in conflict with plaintiff's testimony that the turning car did not interfere with her vision of westbound lanes 2 and 3, that she did look down those lanes as she started the turn, and as she pulled into westbound lane 1; that those lanes were clear before and at the time she started her turn. ██ Moreover, the driver of the south turning car waved her on. She was in low gear, signaling a left turn and proceeding very slowly. It is difficult to see what more she could have done to protect herself and her baby. She could hardly have anticipated that a car would dart out from behind the turning car and plow into any object that was crossing to the north. She had stopped for several westbound cars to pass her and was entitled to assume that any others going in the same direction would exercise ordinary care, could properly act upon that assumption until alerted to the contrary by some fact or circumstance.

██ "It is an elementary principle that negligence is gauged by the ability to anticipate danger. '[R]easonable foresight of harm is essential to the concept of negligence, and supplies the criterion for determining whether it exists in a particular case, and reasonable foreseeability of harm is the fundamental basis of the law of negligence. . . . On the other hand, one is not bound to foresee every possible injury which might occur, or every possible eventuality, but only those which were reasonably foreseeable; and one is not required to anticipate against dangers which it is not his duty to avoid.' (65 C.J.S. § 5c (2) (a) pp. 354-359.)'' (*Tucker* v. *Lombardo*, 47 Cal.2d 457, 464 [303 P.2d 1041].) ██ Moreover, "[d]efendant was entitled to assume that others would exercise reasonable care in the management of their own property and could properly continue to do so until apprised in some manner that such reliance was no longer reasonably safe.'' (*Rodela* v. *Southern Calif. Edison Co.*, 148 Cal.App. 2d 708, 716 [307 P.2d 436].) See also *Bogner* v. *Eubanks*, 137 Cal.App.2d 181, 183-184 [289 P.2d 875], and cases therein cited and quoted.

Upon appellant's own theory of the evidence there was at least a substantial question whether plaintiff was guilty of contributory negligence; certainly there would be no justification for declaring her so as a matter of law.

The above evidence not only sustains the granting of the motion in the personal injury case, but it also supports the ruling in the wrongful death case unless it can be said as

matter of law that the injuries received by the mother in the accident were not a proximate cause of the death of the child.

Mr. Hahn drove Mrs. Hughey home from the Mercedes-Benz agency, a short distance, arriving about 8 o'clock. She went to bed at once and took a sedative, seconal; her husband arrived in a half hour. She then had a "dreadful" pain in her abdomen; was crying, and he called the doctor. She was not then taken to the hospital and was not bleeding externally at that time. She slept until about 3 a. m., awakening with a "terrible" pain and was hemorrhaging freely. The husband heard her cry and went to her where she lay in a pool of blood. She was then rushed to the hospital where Dr. Aaberg, obstetrician, and Dr. Brooks, pediatrician, were awaiting her. An immediate Caesarean section was essential and was performed, delivering a five pound two ounce boy who was four to six weeks premature. The mother, a professional ballerina, was so built that she could make normal delivery of a large child and had no evidence of any disease or disorder which would cause premature birth or require a Caesarean delivery.

While in the womb a baby's lungs are collapsed and it is furnished oxygen by the mother through the placenta. Immediately upon delivery, with the first cry, the lungs normally begin to expand and perform their proper function. This is more difficult for a premature baby because of lack of strength. In this instance the little boy had undergone fetal distress and was cyanotic due to lack of oxygen, did not benefit much from administration of oxygen, and died within 24 hours with his lungs still collapsed to a large extent. This condition is known as atelectasis and is a continuation after birth of the normal collapse of the lungs while *in utero*. According to the attending obstetrician plaintiff, having been thrown to the side of the door, suffered internal bleeding (as evidenced by organized clots found by him at the time of the Caesarean operation), which increased until it appeared externally about 3 a. m. This bleeding evidenced a partial separation of the placenta from the womb, to the extent of not less than one-fourth and almost one-half of its area. This caused intra-uterine asphyxia of the baby, as indicated by his condition immediately after delivery. Though there are several possible causes of placental separation, none of them was present in this case except one,—trauma, a jar, wrench or twist received by the mother. Trauma to her is a recognized cause of such separations. In this case, according to the expert testimony of the obstetrician, the separation was

due to the automobile accident. Dr. Aaberg testified: "That this placenta in Mrs. Yvonne Hughey separated due to the automobile accident, which—— . . . Q. In other words, Doctor, you have said, I believe, that the placenta separation was caused by the accident, in your opinion? A. In my opinion, absolutely. . . . As I said, approximately one-fourth of the placenta was separated. In another hour or two maybe all of it could have been, with a dead baby, and deeper shock for her, profound shock; in some cases, in fact, irreversible shock. We cannot bring them out despite ten or fifteen transfusions." On cross-examination: "Q. Doctor, I gather from your testimony that you feel very positive that the accident was responsible for the placental separation in this case which led to the Caesarean and so on? A. That is right."

To an extent, defendant's experts corroborated Dr. Aaberg's testimony as to basic facts and the opinion predicated thereon. Dr. Harry L. Deutsch, who performed an autopsy upon the little boy, expressed the opinion that death was caused by "congenital pulmonary atelectasis and congenital heart disease." Those are the words that he used in the death certificate also. Of course, the atelectasis was congenital, for that word merely means existing at the time of birth, and there is no other time for atelectasis to occur. The word "congenital" adds nothing to the term "atelectasis."

The congenital heart disease which he said he found consisted of a large opening in the interventricular septum, "which is a partition which separates the right and left ventricles. . . . A defect of this size would permit a substantial amount of blood to be shunted from the right ventricle into the left ventricle so that this blood which has been shunted doesn't have an opportunity to circulate through the lungs. Therefore, there is a lesser amount of oxygen in the blood that is forced out of the left ventricle into the general systemic circulation, because of this defect." This asserted cause of death was developed in the defense evidence and plaintiffs did not recall their experts to refute it directly. But they had the autopsy report before them and anticipated the Deutsch testimony. All the experts expressly or tacitly agreed that the heart is completely formed and functioning after 19 weeks. Dr. Brooks testified that the heart tones were good at and after birth; that he found no congenital heart defect, and that the phrase "interventricular septal defect" means the same thing as congenital heart defect. Dr. Aaberg testified that the baby had a good fetal

heart rate, very normal during pregnancy; that the heart tones were good; that a congenital heart would show loud murmurs. Dr. William B. Thompson, obstetrician, testified for the defense after reading all the depositions and transcripts of testimony (a new ultimate in expressing an expert opinion upon the ultimate question for the jury). He said: ''Q. And if I understand what you are saying, then, it is that you ascribed your findings to this condition in the interventricular septum that you have described? A. I felt that that was the primary cause of the baby's failure to behave normally.''

 If it were conceded that defendant had established as matter of law that congenital heart disease was a cause of death of this baby, that did not preclude a recovery by plaintiffs, for defendant's proof showed two concurring causes, atelectasis and heart disease. Assuming that the heart defect was prenatal and in no wise affected by the accident, it nevertheless appears that that was not true of the atelectasis. We have then concurring proximate causes, one of which flowed directly from the negligence of defendant. In this situation the concurrence of the nontortious cause does not absolve defendant from liability for the tortious one. In *Brown* v. *Guy, supra,* 144 Cal.App.2d 659, 666, we said: ''It is the law of this state that each of several joint tort feasors or independent wrongdoers who inflict simultaneous, or practically simultaneous, injuries upon a plaintiff must carry the burden of establishing that his own wrong did not contribute to the damages, or the extent to which it did so. (See *Copley* v. *Putter,* 93 Cal.App.2d 453, 457 [207 P.2d 876]; *Cummings* v. *Kendall,* 41 Cal.App.2d 549, 558 [107 P.2d 282]; *Finnegan* v. *Royal Realty Co.,* 35 Cal.2d 409, 433 [218 P.2d 17]; Prosser on Torts, 2d ed., § 45, p. 226.) The Finnegan case says, at page 433: 'Where several persons act in concert and damages result from their joint tort, each person is held for the entire damages unless segregation as to causation can be established. Even though persons are not acting in concert, if the results produced by their acts are indivisible, each person is held liable for the whole. Death, burning of a building or the sinking of a boat are such indivisible results. The reason for imposing liability on each for the entire consequence is that there exists no basis for dividing damages and the law is loath to permit an innocent plaintiff to suffer as against a wrongdoing defendant. This liability is imposed where each cause is sufficient in itself as well as where each

cause is required to produce the result. (15 So.Cal.L.Rev. 439.)' '' ■■■ Prosser on Torts, 2d ed., section 45, page 226, says: ''Certain results, by their very nature, are obviously incapable of any practical division. Death is such a result, and so is a broken leg or any single wound, the destruction of a house by fire, or the sinking of a barge. No ingenuity can suggest anything more than a purely arbitrary apportionment of such harm. Where two or more causes combine to produce such a single result, incapable of any logical division, each may be a substantial factor in bringing about the loss, and if so, each may be charged with all of it. . . . Such entire liability is imposed both where some of the causes are innocent, as where a fire set by the defendant is carried by a wind, and where two or more of the causes are culpable.'' Footnote 63 on that page adds this: ''Obviously only culpable causes will be held responsible. Thus where a negligent automobile driver collides with an innocent one and injures a third person, only the negligent driver is liable.'' No attempt at apportionment was made here and of course none could be effected.

■■■ Appellant's contention that the heart defect would ultimately have caused death independently of the atelectasis cannot be sustained. Assuming that that would have happened, defendant is nevertheless liable for any negligence which operated as a precipitating or accelerating cause of death. *Kerby* v. *Elk Grove Union H. S. Dist.*, 1 Cal.App.2d 246, 251 [36 P.2d 431]: ''But even though a latent chronic aneurism of the cerebral artery may have ultimately caused his death without the intervention of violent exercise or traumatic injury, if the blow from the ball did in fact accelerate or aggravate the chronic defect of the artery so as to cause a rupture thereof resulting in death, that blow may be deemed to have been the proximate cause of death so as to create a liability therefor under proper circumstances. (*Knock* v. *Industrial Acc. Com.*, 200 Cal. 456 [253 P. 712]; *Quail* v. *Industrial Acc. Com.*, 138 Cal.App. 412 [32 P.2d 402].)'' To the same effect are, *Deevy* v. *Tassi*, 21 Cal.2d 109, 123 [130 P.2d 389]; *Knock* v. *Industrial Acc. Com.*, 200 Cal. 456, 460, 461 [253 P. 712]; *Lumberman's Mut. Cas. Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 492, 496 [175 P.2d 823]; *Firestone Tire etc. Co.* v. *Industrial Acc. Com.*, 93 Cal.App.2d 23, 26 [208 P.2d 44]; 8 Cal.Jur. § 21, p. 962; 35 Cal.Jur.2d, § 57, p. 555, § 59, p. 557; 25 C.J.S. § 25, pp. 1093-1094.

The order granting a new trial in each case is well supported by the record and we find no error therein.

Order affirmed.

Herndon, J., and Kincaid, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.