103 Cal.Rptr.2d 131 (2001)
86 Cal.App.4th 167
Janice BIRD et al., Plaintiffs and Appellants,
v.
Rolando SAENZ et al., Defendants and Respondents.
No. B134886.
Court of Appeal, Second District, Division Seven.
January 11, 2001.
Review Granted May 16, 2001.
*132 Steven G. Cohn, Sacramento, a Law Corporation, and Steven G. Cohn for Plaintiffs and Appellants.
Schmid & Voiles and Suzanne De Rosa, Los Angeles, for Defendants and Respondents Rolando Saenz and David M. Fung.
Bonne, Bridges, Mueller, O'Keefe & Nichols, David J. O'Keefe, Patricia Egan Daehnke, and Michael A. Gregg, Los Angeles, for Defendant and Respondent Scott M. Eisenkop.
LILLIE, P.J.
Plaintiffs Janice Bird, Dayle Edgmon, and Kim Moran, three daughters of decedent Nita Bird, appeal from judgment of dismissal after the court granted summary adjudication of issues in favor of three doctors who treated Nita Bird. Given that *133 triable issues of fact exist with respect to the causes of action for wrongful death and negligent infliction of emotional distress, judgment of dismissal was improperly granted.[1]

FACTUAL AND PROCEDURAL BACKGROUND
In October 1994, 68-year-old Nita Bird (Bird) underwent an exploratory laparotomy, de-bulking surgery, and other procedures performed by defendant Scott M. Eisenkop (Eisenkop); the postoperative diagnosis was stage IIIC ovarian cancer; Eisenkop's report indicated that the de-bulking was adequate with no visible residual cancer remaining; however, four of twelve periaortic and pelvic lymph nodes were involved, all of them on the right side.
Subsequent to the October 1994 surgery, Bird began an initial course of chemotherapy, which was the standard chemotherapy for patients diagnosed with stage IIIC ovarian cancer. Prior to chemotherapy, Bird had a CA125 level of 1830; subsequent to the first dose of chemotherapy, she had a CA125 level of 14, which is within normal range. According to the declaration of plaintiffs expert medical witness, Dr. Steven Armentrout (Armentrout), the dramatic improvement in CA125 level showed that the chemotherapy was working properly; as a result of an adequate initial debulking and a favorable response to chemotherapy, Bird's prognosis was better than the prognosis for the average patient with stage IIIC ovarian cancer prior to November 30, 1994.
On November 30, 1994, Bird was admitted to West Hills Hospital for the placement of a "port-a-cath," or catheter, to facilitate chemotherapy; defendants Eisenkop and Rolando Saenz (Saenz) were involved in performing Bird's surgery and David M. Fung (Fung) was the anesthesiologist; prior to the surgery, Bird and her daughters understood that the insertion of the port-a-cath was a simple outpatient procedure which would take only about 20 minutes. At some point during this placement procedure, Bird's subclavian artery and subclavian vein were transected and serious complications occurred; a thoracic surgeon, Dr. Yasuda, not a defendant herein, was called and surgery was performed which allegedly saved Bird's life.
According to the declaration of plaintiffs expert witness, Dr. Lester Cohn, an orthopedic surgeon, Eisenkop attempted to insert the port-a-cath for almost one hour, from 2:35 p.m. to 3:30 p.m.; because Eisenkop was having difficulty placing the port-a-cath, he called for a "thoracic surgeon stat," and Saenz responded and began attempting to insert the port-a-cath. At 3:30 p.m., Bird's pulse began to increase and her blood pressure to drop, a classic indication of internal bleeding. Bird was then intubated because the swelling around her neck was compromising airflow. Bird was also given intravenous fluids, but her condition failed to stabilize. Believing that they had successfully placed the port-a-cath, Eisenkop and Saenz ended the surgery at about 4:10 p.m.; Bird remained in the operating room and received additional liters of intravenous fluids until 5:00 p.m., when she was transferred to the critical care unit.
Bird's daughter Janice Bird saw her mother being wheeled down the hallway from the operating room to the critical care unit; Bird was purple and blown up like a balloon. At about 5:30 p.m., defendants called for Dr. Yasuda, a vascular/thoracic surgeon. At about 5:50 p.m., Yasuda had Bird rolled back down the hallway to the operating room with her feet high in the air; her daughters Janice Bird and Dayle Edgmon saw their mother, blown up like a balloon, as she was rolled back to the operating room; they believed their mother was bleeding to death as they *134 watched. Yasuda performed two surgeries on Bird later that day.
According to Armentrout, the failed attempt to insert the port-a-cath caused Bird to suffer numerous other problems, including kidney failure, adult respiratory distress syndrome, multiple cerebral and cerebellar and midbrain infarcts, and skin sloughing. The complications arising out of the failed attempt to insert the port-a-cath also caused a significant and lengthy delay in administration of the second course of chemotherapeutic agents; the failure to administer chemotherapeutic agents and other medications in the appropriate doses over an appropriate time period increases the tendency to drug resistance.
Bird received her second dose of chemotherapy in February 1995, and a third dose in March 1995, both apparently in reduced doses. Bird received increasing doses of chemotherapy in April and June 1995. On September 5, 1995, when her CA125 was increasing, Bird received another course of chemotherapy. After her CA125 continued to increase, she was hospitalized in October 1995 for her first course of treatment with Taxol and Cis Platin. According to Armentrout, because of the complications arising out of the failed attempt to insert the port-a-cath, Bird received less than 80 percent of the chemotherapeutic agent she was supposed to receive and over a period twice as long as intended.
After Bird began to have vomiting associated with abdominal adhesions, she underwent an exploratory laparatomy on November 27, 1995; the surgery revealed extensive cancer involving most of the intestines. On December 14, 1995, Bird was discharged home to the care of her family; she died on January 15, 1996. The death certificate listed the "immediate cause" of death as "peritoneal carcinomatosis," with the time interval between onset and death as 16 months. The death certificate also listed under "other significant conditions contributing to death but not related to [the peritoneal carcinomatosis], "chronic obstructive pulmonary disease."
A complaint was filed in November 1995, prior to Bird's death, by Bird and her daughters, for medical malpractice and negligent infliction of emotional distress. After Bird's death, a first amended complaint was filed by Bird's three daughters and by Janice Bird as representative of the estate of Bird. The first amended complaint (complaint) asserted a medical malpractice/wrongful death claim as well as a cause of action for negligent infliction of emotional distress. The wrongful death cause of action expressly alleges that as a result of defendants' negligence and carelessness, Bird died on January 15, 1996.
After answering the complaint, defendants moved for summary adjudication of the wrongful death cause of action and subsequently filed a separate motion for summary adjudication of the cause of action for negligent infliction of emotional distress. As to the wrongful death claim, defendants argued that Bird died of cancer and that there was no causation "between defendant's alleged negligence and Ms. Bird's death from cancer."[2]
Defendants argued that as a matter of law there is no recovery "for a so-called `lost chance' of a cure or lost days of life, i.e., for a possible rather than a probable cure, and/or a possible lengthening of *135 plaintiffs life." Defendants relied primarily upon the declaration of their medical expert, Dr. Cynthia Forsthoff (Forsthoff). She declared that to a reasonable degree of medical probability Bird's ovarian cancer was incurable as of October 1994, when it was diagnosed; that Bird had, "at best a 35 percent chance of a cure of her cancer (defined as five-year survival following the diagnosis) in October 1994 when her cancer was diagnosed, even assuming she received uninterrupted chemotherapy and there were no complications in her medical treatment such as the kind that developed in connection with and subsequent to, the placement of the port-a-cath on November 30, 1994." Forsthoff also declared that the median five-year survival rate for the type of cancer that Bird had, stage IIIC ovarian cancer, is 35 percent; thus, the care and treatment rendered by defendants in connection with the port-a-cath procedure and/or the medical complications following it, and/or the three-month delay in administering chemotherapy, "did not cause Bird's cancer to progress from probably curable (i.e., 51 percent chance of five-year survival), to probably incurable (i.e., less than 51 percent chance of five-year survival)."
Forsthoff's declaration addressed the issue of whether Bird's cancer was curable or incurable in October 1994, when it was diagnosed, and asserted that Bird then had only a 35 percent chance of surviving for five years thereafter. However, Forsthoff s declaration was silent on the issue of the cause or causes of Bird's death in January 1996.
In opposition to the foregoing motion, plaintiffs argued essentially that defendants' motion had set up and attacked essentially a red herring, i.e., a standard of causation that was not asserted by plaintiffs and not in issue in this case. Plaintiffs argued that the concept of a cure for cancer has "absolutely nothing to do with the matters at issue in this litigation and is merely an effort by defendants to obfuscate the true issues in this case." What is at issue in this case, as asserted by plaintiffs, is whether as a result of defendants' negligence, Bird died several years earlier than she should have, and whether defendants' negligence was a substantial factor in bringing about Bird's death on January 15, 1996. Plaintiffs argued in their opposition that the complications arising out of the port-a-cath procedureincluding the extreme trauma of opening Bird's chest for emergency surgery, adult respiratory distress syndrome, and kidney failure-were substantial factors contributing to Bird's death.
In opposition, plaintiffs' offered the declaration of their medical expert, Dr. Armentrout. He declared that in his opinion, to a reasonable degree of medical probability, the set of complications resulting from the failed attempt to insert the port-a-cath in November 1994 was a substantial factor in causing Bird's death on January 15, 1996; the purpose of chemotherapy and debulking surgeries to remove cancer, is to increase the patient's life span; if the complications had not occurred, Bird would not have died on January 15, 1996; rather, to a reasonable degree of medical probability, Bird would have lived for additional years, not months. Armentrout concluded: "In my opinion, to a reasonable degree of medical probability, the failed November 30, 1994 port-a-cath insertion was a substantial factor in causing the death of Nita Bird on January 15,1996."
With respect to the motion for summary adjudication on the cause of action for negligent infliction of emotional distress, which plaintiffs admit is based on the bystander theory, defendants argued that Janice Bird and Dayle Edgmon could not recover as a matter of law because they did not contemporaneously witness the transection of the artery during the placement of the port-a-cath, but only learned of the injury after it had occurred. Thus, they did not observe the injury-producing event itself, but only the consequences of that injury.
*136 In opposition, plaintiffs argued that the injury producing event was not limited to the transection of Bird's artery, but defendants' failure to diagnose and to treat the injuries Bird sustained during and after the insertion of the port-a-cath. In other words, defendants asserted that the injury producing event ended at about 4:10 p.m. when defendants, believing they had successfully placed the port-a-cath, ended their surgery; plaintiffs asserted that the injury producing event continued at least up to about 5:50 p.m. when Dr. Yasuda arrived to perform the surgery which allegedly saved Bird's life. According to the declaration of plaintiffs' expert, Dr. Lester Cohn, "the negligent conduct of defendants was not merely defendants' transection of Nita Bird's subclavian artery and subclavian vein, but also defendants' negligent failure to diagnose and treat Nita Bird's transected subclavian artery and transected subclavian vein for hours after the original surgery was `completed.'"
After hearings thereon in April and May 1999, the court granted both motions for summary adjudication of issues. With respect to the cause of action for wrongful death, the order granting summary adjudication stated that defendants had shown there were no triable issues of material fact "under the authority of Bromine v. Pavitt (1992) 5 Cal.App.4th 1487, 1504-1505, 7 Cal. Rptr.2d 608, because moving parties established through competent and admissible evidence and reasonable inferences deducible therefrom, including the declaration of defendants' medical expert, Cynthia Forsthoff, that the decedent did not have more than a fifty percent chance of surviving her cancer immediately prior to the alleged malpractice, which was not contradicted by plaintiffs through other inferences or evidence which raised a triable issue as to any material fact."
With respect to the cause of action for negligent infliction of emotional distress, the court granted the motion on the ground that Bird's two daughters "were not present in the operating room or the operating room theater when the artery was transected," but that they "were there during I guess part of the aftereffect of the transection, and, arguably, from your [plaintiffs'] side ... while the malpractice was taking place or at least the immediate effect of the malpractice." The court found that under the facts presented here the plaintiffs could not recover under the bystander theory of negligent infliction of emotional distress.
On June 24,1999, a judgment of dismissal was filed, dismissing the complaint of plaintiffs based on the prior two rulings on the motions for summary adjudication of issues. Plaintiffs filed timely notice of appeal from the judgment.
A defendant meets his burden upon a motion for summary judgment or summary adjudication if that party has proved that one or more elements of the cause of action cannot be established, or that there is a complete defense to the cause of action. (Campanano v. California Medical Center (1995) 38 Cal.App.4th 1322, 1327, 45 Cal.Rptr.2d 606.) Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists. (Ibid.) On appeal, we exercise an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court; we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it. (Ibid.)

I

WRONGFUL DEATH CAUSE OF ACTION
"The wrongful death cause of action was both created and limited by the Legislature." (Bromme v. Pavitt, supra, 5 Cal. App.4th at p. 1497, 7 Cal.Rptr.2d 608.) Under Code of Civil Procedure section 377, "the plaintiff must prove the death was `caused by' the defendant's wrongful *137 act or neglect, i.e., the wrongful act or neglect was a cause in fact of the death. [Citations.] To be a cause in fact, the wrongful act must be `a substantial factor in bringing about' the death. [Citations.] [¶] Ordinarily, `the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.'" (5 Cal.App.4th at pp. 1497-1498, 7 Cal.Rptr.2d 608.)
However the test is phrased, causation in fact is ultimately a matter of probability and common sense; it is enough that plaintiff produces evidence from which reasonable people may conclude that it is more probable than not that the harm was caused by the defendant. (Espinosa v. Little Co. of Mary Hospital (1995) 31 Cal. App.4th 1304, 1314, 37 Cal.Rptr.2d 541.) "`Conduct can be considered a substantial factor in bringing about harm if it "has created a force or series of forces which are in continuous and active operation up to the time of the harm' [citation], or stated another way, "the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another" [citation].'" (Ibid.) The plaintiffs "inability to pin down the exact extent to which defendants' conduct contributed to the outcome is immaterial for purposes of causation. Clearly, where a defendant's negligence is a concurring cause of an injury, the law regards it as a legal cause of the injury, regardless of the extent to which it contributes to the injury." (Id. at pp. 1317-1318, 37 Cal.Rptr.2d 541, fn. omitted, citing to BAJI No. 3.77.)
Where there are two concurrent causes of death, one of them flowing directly from the negligence of the defendant, and the other involving a nontortious cause such as a disease or congenital defect, "the concurrence of the nontortious cause does not absolve defendant from liability for the tortious one." (Hughey v. Candoli (1958) 159 Cal.App.2d 231, 240, 323 P.2d 779 [pregnant woman injured in auto accident who delivered oxygen-deprived baby who died could recover from defendant driver who caused traumatic separation of placenta and intra-uterine asphyxia, even if baby had a congenital heart disease, as evidence showed two concurring causes of baby's death, pulmonary atelectasis and congenital heart disease].) The court in Hughey also stated that the defendant's contention that the heart defect would ultimately have caused death independently of the atelectasis was without merit: "Assuming that that would have happened, defendant is nevertheless liable for any negligence which operated as a precipitating or accelerating cause of death." (Id. at p. 241, 323 P.2d 779.)
More recently in Logacz v. Limansky (1999) 71 Cal.App.4th 1149, 84 Cal.Rptr.2d 257, the court held that plaintiffs in a wrongful death action were entitled to instruction on concurrent causation where plaintiffs provided evidence that defendant gynecologist's negligence caused post-hysterectomy pulmonary emboli, the cause of decedent's death; defendant provided evidence that the decedent's obesity and failure to follow medical instructions and seek timely treatment may have caused her death. The court held that even if the defendant established as a matter of law that "any one or all of these factors was a cause of Cynthia's death, [defendant's] negligence could also have been a cause of her death acting in combination with them. Multiple or concurring causes of Cynthia's death do not preclude recovery by plaintiffs." (Id. at p. 1159, 84 Cal.Rptr.2d 257.)
In light of the foregoing, we conclude that under the traditional rules of causation set out above, appellants presented sufficient evidence to create a triable issue of fact as to whether respondents' negligence was a substantial factor in bringing about their mother's death. This is not a case where the theory of liability is a failure to timely diagnose and treat cancer, as in Bromme v. Pavitt, supra, 5 Cal.App.4th 1487, 7 Cal.Rptr.2d 608, or where appellants are attempting to alter *138 traditional rules of causation or to redefine the damages recoverable in a wrongful death action.[3] Rather, appellants' theory of liability appears to be that respondents' negligent treatment for Bird's cancer aggravated her existing condition and created new complications which were substantial factors in causing her death. Although it was the basis of the summary adjudication motion, the theory of lost chance is not pleaded nor asserted by the plaintiffs herein and is simply inapposite. Respondents' and the trial court's reliance on Bromme v. Pavitt, supra, 5 Cal.App.4th 1487, 7 Cal.Rptr.2d 608, is misplaced.
In Bromme, the husband of a woman who died of colon cancer in 1984 brought a wrongful death action against the doctor who treated her from 1979 until her death on the ground that the doctor negligently failed to detect the cancer even though the decedent complained to him of abdominal pain in June 1980 and September 1981; the cancer was diagnosed in September 1981. The court held that a partial nonsuit was properly granted the defendant doctor as to any alleged negligent acts after June 1981, as it was established that after that time, decedent's chance of successful treatment was less than 50 percent. In upholding the partial nonsuit, the court held that the "uncontradicted evidence established that Bromme's chance of surviving the cancer after June 1981 was less than 50 percent even if defendant had not been negligent, i.e., that it was not medically probable defendant's alleged negligence after June 1981 was a substantial factor in causing Bromme's death." (5 Cal.App.4th at p. 1503, 7 Cal.Rptr.2d 608.)
Bromme thus involved the situation where upon a nonsuit, the evidence was insufficient to establish that a doctor's failure to diagnose cancer at a certain point in time was a substantial factor in causing the decedent's subsequent death from cancer. That is not the factual or procedural situation here.
The instant case is also distinguishable from another case relied upon by respondents, Dumas v. Cooney, supra, 235 Cal. App.3d 1593, 1 Cal.Rptr.2d 584. Dumas was a medical malpractice action predicated upon delayed diagnosis and treatment of lung cancer, where the jury was instructed *139 on the theory of lost chance and found in plaintiffs favor. On appeal, the court concluded the instruction was error and reversed and remanded for a new trial. The court held that "The instruction allows for damages for possible cure and possible lengthening of life and/or improved personal comfort from more prompt diagnosis and treatment. California law does not permit tort compensation for a mere possibility. Redefining lost chance as a new form of injury simply does not diminish that the theory radically alters the meaning of causation." (Id. at p. 1610,1 Cal.Rptr.2d 584.)
The lost chance cases cited by respondents are simply inapposite. Here, the allegations of the complaint and the evidence presented by appellants establishes that to a reasonable medical probability, respondents' negligence was a substantial factor in causing Bird's death on January 15, 1996. Respondents' evidence was addressed only to the non-issue of whether their alleged negligence caused Bird's cancer to progress from curable to noncurable status. Respondents' motion did not provide evidence negating the allegation (and appellants' evidence), that their negligence was a substantial factor in causing Bird's death on January 15, 1996. Without merit also is respondent Eisenkop's argument that "appellants are required to prove that decedent's death was more probably than not caused by respondents' actions rather than her cancer." Not only does this argument improperly place the burden on appellants, when it is respondents' burden on summary adjudication to negate the claim being asserted by appellants, but it ignores the principles of concurrent causation set out above.
Inasmuch as the evidence in our record did not establish that respondents were entitled to summary adjudication on the wrongful death cause of action, the court erred in granting the motion.

II

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
"The Supreme Court has established a three-part test which must be satisfied in order for a plaintiff to state a cause of action for `bystander' negligent infliction of emotional distress: `In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness.' (Thing v. La Chusa (1989) 48 Cal.3d 644, 647, 257 Cal.Rptr. 865, 771 P.2d 814) In the absence of immediate presence at the injury-producing event, recovery is precluded." (Campanano v. California Medical Center, supra, 38 Cal. App.4th at p. 1328, 45 Cal.Rptr.2d 606.)
At issue in the motion for summary adjudication, and on this appeal, is only the second prong of the three-part test under Thing. Respondents contend that because appellants did not witness the actual transection of Bird's arteries, they did not have the requisite contemporaneous awareness. With respect to the failure to diagnose and treat the immediate complications arising from the port-a-cath surgery, respondents argue that the failure to diagnose is not an event that is capable of perception by a lay person.
No case called to our attention has declared that the contemporaneous awareness requirement of Thing can only be satisfied by a visual perception of the event, as the Thing court's analysis "did not indicate disapproval, however, of the holding in Krouse [v. Graham (1977) 19 Cal.3d 59, 137 Cal.Rptr. 863, 562 P.2d 1022] that the plaintiff need not visually perceive the injury while it is being inflicted." (Wilks v. Hom (1992) 2 Cal.App.4th *140 1264, 1271, 3 Cal.Rptr.2d 803.) Thus, Thing only requires that plaintiffs "experience a contemporaneous sensory awareness of the causal connection between the negligent conduct and the resulting injury." (Golstein v. Superior Court (1990) 223 Cal.App.3d 1415, 1427, 273 Cal.Rptr. 270.)
In Zuniga v. Housing Authority (1995) 41 Cal.App.4th 82, 48 Cal.Rptr.2d 353, plaintiff was a surviving family member in a housing project whose relatives died in a fire allegedly set by drug dealers with violent tendencies; defendant demurred to the cause of action for negligent infliction of emotional distress on the ground that plaintiff did not observe the injury producing event because he did not arrive at the residence until after emergency personnel were already at the scene. In reversing the order sustaining the demurrer, the court, noting that the complaint alleged that plaintiff witnessed the rescue efforts and futile attempts to extinguish the fire, stated that "It appears that he [plaintiff] arrived while the fire was still causing damage, and possibly still causing injury to his many relatives inside. This case may therefore be distinguished from Fife [v. Astenius (1991) 232 Cal.App.3d 1090, 284 Cal.Rptr. 16], and, based on the allegation of the complaint, Lopez may proceed as a plaintiff in the fourth cause of action." (Id. at p. 103, 48 Cal.Rptr.2d 353.) Zuniga characterized Fife as a case where a family heard a nearby vehicle collision, went outside their home, climbed over a wall, and found a family member inside one of the vehicles involved in the crash.
Thus, under Zuniga, it is clear that the plaintiff need not be present for all aspects of the injury producing event, as long as the plaintiff was present at the scene where injury was still occurring and was aware of the injury to the victim. "The `event' witnessed in a Dillon [i.e., bystander] case need not, however, be a `brief and sudden occurrence' producing an immediate injury. A course of negligence lasting over a period of several hours, and witnessed by the plaintiff, is actionable." (Budavari v. Barry (1986) 176 Cal.App.3d 849, 853, fn. 4, 222 Cal.Rptr. 446.)
In the instant case, Janice Bird provided testimony and a declaration that she was present at the hospital from the beginning of the port-a-cath procedure; as the surgical procedure dragged on, she became concerned it was taking too long; she became anxious and then heard over the loudspeaker system a call for "thoracic surgeon needed in surgery, stat." Because all the other surgeries were completed, she knew the thoracic surgeon was being called for Bird; she then called her sister Dayle Edgmon, and told her that something had gone wrong; after the surgery ended, Dr. Eisenkop came out and told her that he had had more trouble than anticipated in inserting the port-a-cath, that her mother might have had a bubble in the vein, and that she might have had a stroke. Janice Bird then again called Edgmon and relayed the information; after speaking with Edgmon, Janice Bird saw her mother being taken down the hallway from the operating room to the critical care unit; her mother had her feet up in the air and she was purple and "blown up like a balloon." Janice Bird also saw doctors rushing through the hallways carrying sacks of blood to pump into Bird; at this time, she was in a panic, and believed her mother was severely injured and that the injury was continuing. At about 5:30 p.m., when Bird was rolled back down the hallway to the operating room, Dayle Edgmon had arrived and both Dayle and Janice saw that their mother was even more blown up like a balloon than before.
Dayle Edgmon also declared that she arrived at the hospital soon after her mother was taken from the operating room to the critical care unit; she saw her mother being rolled from the critical care unit back to the operating room at about 5:30 p.m.; her mother was purple and blown up like a balloon. Both Edgmon and Janice Bird declared that at this point they were aware that "our mother was bleeding to *141 death as we watched." They both remained at the hospital for hours, until two subsequent surgeries were completed by Dr. Yasuda.
Respondents failed below, and fail here, to provide any pertinent authority to support their proposition that the "injury-producing event" under Thing is limited to the actual transection of the blood vessels of Bird and to the act of alleged misdiagnosis, and that appellants cannot recover because they did not witness the former act of transection and because the latter act of misdiagnosis was incapable of perception by a lay person.[4] The problem with this argument is that it assumes that appellants must witness the negligent act or acts themselves, which is not the test as set out in Thing. The language of the test-"present at the scene of the injury producing event"is clearly intended to describe the plaintiff "who contemporaneously observes both the event or conduct that causes serious injury to a close relative and the injury itself." (Thing v. La-Chusa, supra, 48 Cal.3d at p. 667, 257 Cal.Rptr. 865, 771 P.2d 814; emphasis added.)
Appellants certainly were percipient witnesses to the event, as one or both appellants observed many aspects of respondents' course of treatment of their mother, including respondents' allegedly premature ending of the surgery at about 4:00 p.m., her mother's transfer from the operating room to the critical care unit, and then the transfer back from the care unit to the operating room again at about 5:30 p.m. Appellants also saw at least some aspects of the resulting injury to their mother, including her swollen and purple condition. "A course of negligence lasting over a period of several hours, and witnessed by the plaintiff, is actionable." (Budavari v. Barry, supra, 176 Cal.App.3d at p. 853, fn. 4, 222 Cal.Rptr. 446.) To the extent that the injury-producing event includes the alleged negligent care and treatment of Bird outside the operating room, it remains a triable issue of fact as to whether appellants meet the test under Thing. On this record, we cannot conclude that as a matter of law the injury-producing event was either not perceived by appellants or of a nature incapable of being perceived.
This case is distinguishable from several cases cited by respondents. In Golstein v. Superior Court, supra, 223 Cal.App.3d 1415, 273 Cal.Rptr. 270, the court upheld a ruling sustaining a demurrer to an emotional distress claim premised on the "bystander" theory. The complaint alleged that plaintiffs' child died from radiation poisoning as a result of negligent administration of an overdose of radiation for treatment of curable cancer; the parents were informed of the excessive radiation after the fact; they did not, and could not, observe the radiation overdose and during the radiation therapy they were unaware their son was being overexposed. The complaint further alleged that, by its very nature, the radiation treatment produced an injury that was not immediately visible and caused no obvious or immediate visible injury; however, after a period of time, the results of the radiation poisoning became visible and caused a "grotesque alteration" of their son's appearance, and the parents contemporaneously observed the deteriorating and worsening condition of their son. (Id. at p. 1418, 273 Cal.Rptr. 270.)
Unlike the situation in Golstein, appellants here were present at the scene of the *142 injury-producing event, they witnessed some of respondents' conduct and at least some of the injury to their mother, and they were aware that something was indeed going wrong and their mother was suffering injury.
Similarly unavailing to respondents is Budavari v. Barry, supra, 176 Cal.App.3d 849, 222 Cal.Rptr. 446. There, plaintiff conceded on appeal after the sustaining of a demurrer, that the defendants' failure to detect her husband's lung cancer or to follow up on X-ray findings, at a time when the husband was hospitalized for injuries sustained in an automobile accident, was not an event that could be witnessed. (See fn. 4, ante.) The negligence in this case does not involve the failure to diagnose cancer or interpret X-rays. Moreover, unlike Budavari appellants here were present in the hospital at the time of the injury-producing event and were aware that it was causing injury to their mother.
Factually distinguishable also is Meighan v. Shore (1995) 34 Cal.App.4th 1025, 40 Cal.Rptr.2d 744. There, the court found a wife had no viable bystander cause of action when she accompanied her husband, who was experiencing chest pains, to the hospital; after tests did not definitively show he had suffered a heart attack, the attending physician told her he was not having a heart attack, and she went home; the next day the husband underwent more tests; the wife returned to the hospital and discovered that her husband had indeed suffered a heart attack. The court held that the facts did not "satisfy the witness and awareness requirement of Thing," and found the closest case on point to be Golstein. (34 Cal.App.4th at pp. 1045-1046, 40 Cal.Rptr.2d 744.)
As we interpret the rationale of the decision in Meighan, it was based on the fact that the plaintiff could not show a contemporaneous sensory awareness of the causal connection between the negligent conduct and the resulting injury, as the negligent conduct occurred the day before she was made aware that any injury had been inflicted upon her husband. In the instant case, however, appellants were present at the injuryproducing event and were at that time aware of the causal connection to resulting injury; when they saw their mother swollen and purple, they believed that they were witnessing their mother bleeding to death.
Because the instant record reveals triable issues of fact exist with respect to the cause of action for negligent infliction of emotional distress, the motion for summary adjudication as to this claim was improperly granted.

DISPOSITION
The judgment is reversed and on remand the trial court is directed to deny the defendants' motions for summary adjudication of issues. Appellants are entitled to costs on appeal.
JOHNSON, J., and WOODS, J., concur.
NOTES
[1] Prior to judgment, plaintiff Kim Moran dismissed her claim for negligent infliction of emotional distress, so only Janice Bird and Dayle Edgmon are appealing the ruling as to this cause of action.
[2] Defendants' motion asserted, and was based on the assumption, that Bird died from cancer and only cancer. While the death certificate lists cancer as the immediate cause of death, it also lists obstructive pulmonary disease as a significant contributing factor. As explained below, other than the death certificate, defendants' motion did not provide any evidence addressing the cause or causes of Bird's death in January 1996, or evidence addressing whether defendants' negligence caused or contributed to the pulmonary disease, and whether that pulmonary disease was a substantial factor contributing to Bird's death. While not necessarily contradicting the assertions in the death certificate, plaintiffs' expert medical witness Dr. Armentrout does provide evidence that the complications caused by defendants' negligence were substantial factors in causing Bird's death.
[3] Respondents' motion for summary adjudication on the wrongful death claim was not addressed to the element of damages, but only the element of causation. Although respondents did present evidence that their alleged negligence did not alter the incurable nature of Bird's cancer (which was alleged to be incurable at the time it was diagnosed in October 1994), and thus established that their negligence did not deprive Bird of a "better than even" chance of recovery, this is not the theory of liability or the type of damages sought in this action. As pleaded, the injury appellants seek to redress is Bird's death.

The California Supreme Court apparently has not yet addressed the lost chance doctrine, although several of our Courts of Appeal have considered and rejected it. Other jurisdictions have apparently adopted different formulations of the lost chance theory. (See Dumas v. Cooney (1991) 235 Cal.App.3d 1593, 1603-1605, 1 Cal.Rptr.2d 584.) Inasmuch as the doctrine, in any formulation, has not been approved by our courts, and appellants do not rely upon it in this case, we are loathe to set out to define it. Moreover, there appears to be confusion as to whether the doctrine relaxes the traditional principles of causation or involves the redefinition of recoverable damages. (See Dumas v. Cooney, supra, 235 Cal.App.3d at pp. 1606, 1608-1610, 1 Cal.Rptr.2d 584.) However, as best as we can understand it, the lost chance doctrine was developed to deal with failure to diagnose cases where the plaintiff had a less than 51 percent chance of recovery and the probable cause of death was the pre-existing disease and not the negligent failure to diagnose it. The gravamen of this theory seems to be that "`damages ought to be recoverable when, due to a doctor's negligence, a patient loses a substantial, though less than probable, chance of survival....'" (Id. at p. 1608, 1 Cal.Rptr.2d 584, citing Fennell v. Southern Maryland Hosp. (1990) 320 Md. 776, 580 A.2d 206, 212.) Thus, the theory would permit damages "for possible cure and possible lengthening of life and/or improved personal comfort from more prompt diagnosis and treatment" (Dumas v. Cooney, supra, 235 Cal. App.3d at p. 1610, 1 Cal.Rptr.2d 584), even though traditional principles of California law do not permit tort compensation for a mere possibility. (Ibid.)
[4] For that matter, the transection and alleged misdiagnosis were also apparently not immediately noticed by respondents at the time they occurred. We do not believe that the bystander theory of recovery requires the plaintiff to have more medical acumen than the defendant doctor so as to be able to "perceive" and understand that a misdiagnosis is being made; rather, all that Thing requires is that the plaintiff be present at the scene of the victim's treatment and be aware that the course of treatment is causing injury to the victim. To the extent that the holding in the pre-Thing case of Budavari v. Barry, supra, 176 Cal.App.3d 849, 222 Cal.Rptr. 446, is inconsistent with the formulation of the test under Thing, it is not controlling here.